

# Missouri Court of Appeals

## Southern District

### Division One

STATE OF MISSOURI, )
)
      Plaintiff-Respondent, )
)
v. ) No. SD33565
) Filed: September 14, 2016
JAMES A. RIGGS, )
)
      Defendant-Appellant. )

APPEAL FROM THE CIRCUIT COURT OF DOUGLAS COUNTY

Honorable R. Craig Carter, Circuit Judge

**<u>AFFIRMED</u>**

After a jury trial, James Riggs (Defendant) was found guilty of committing statutory sodomy in the first degree by having deviate sexual intercourse with A.A., who was less than 14 years of age. *See* § 566.062.[1] Defendant has presented 10 points on appeal. These points involve alleged errors in the admission and exclusion of evidence, the improper use of a teddy bear during A.A.'s testimony and in the State's closing

---

[1] Section 566.062.1 provides that a "person commits the crime of statutory sodomy in the first degree if he has deviate sexual intercourse with another person who is less than fourteen years old." *Id*. All references to statutes are to RSMo Cum. Supp. (2011). All references to rules are to Missouri Court Rules (2016).

argument. Because we find no merit in any of Defendant's points, the trial court's judgment is affirmed.

**Factual and Procedural Background**

Defendant was charged by information with committing the unclassified felony of statutory sodomy in the first degree. *See* § 566.062. The information alleged that Defendant had deviate sexual intercourse with A.A., a child less than 14 years of age, by placing his penis in the child's mouth. In July 2014, a jury found Defendant guilty of statutory sodomy. The court imposed a 15-year sentence.

Defendant does not challenge the sufficiency of the evidence to sustain his conviction. We consider the facts and all reasonable inferences derived therefrom in a light most favorable to the verdict. ***State v. Garrison***, 292 S.W.3d 555, 556 (Mo. App. 2009). All contrary evidence and inferences are disregarded. ***Id***. Viewed from that perspective, the following evidence was adduced at trial.

A.A.'s family met Defendant's family through the families' involvement in Girl Scouts, and the two families became friends. The families would get together for social events approximately once a month, usually at Defendant's home. Sometimes A.A. and her siblings would spend the night at Defendant's home. On one occasion when A.A. was at Defendant's home watching a movie with her sisters, Defendant took A.A. into a basement garage, covered her eyes with a hat, put frosting on his penis, and then put his penis in her mouth. A.A. was eight at the time.

A.A. did not reveal what happened to anyone until over a year later when Defendant showed up at her home on his motorcycle. A.A. got scared and hid under the trampoline in her yard, prompting her to explain to her older sister, K.A., what had happened. K.A. then reported what happened to her oldest sister, who in turn told their

2

stepmother, C.A. (Stepmother). Stepmother called A.A.'s father, M.A. (Father). Because A.A. was already scheduled to see her therapist, Dr. Sara Wilson (Dr. Wilson), Stepmother took A.A. to Dr. Wilson's office. Father met Stepmother and A.A. there. Dr. Wilson briefly interviewed A.A. so as not to disrupt any future police investigations. She also made a hotline call to the Division of Family Services and told Father and Stepmother to report the incident to police. Father and Stepmother then took A.A. to the county sheriff's office to report the abuse. Father and Stepmother were not aware of anyone else who had ever molested A.A.

Robin Buchanan (Buchanan), who worked at that time for Children's Division as an abuse investigator, was assigned A.A.'s case. When Buchanan inquired whether Defendant had asked A.A. to lick icing off his penis, A.A. nodded her head affirmatively. Based on A.A.'s affirmations and her subsequent forensic interview, Buchanan concluded that "most likely something happened" and found abuse by a preponderance of the evidence.

Sheriff Chris Degase then interviewed Defendant, who initially denied ever being alone with A.A. Thereafter, Trooper Donald Jones interviewed Defendant at police headquarters. At the end of that interview, Trooper Jones handed his business card to Defendant and told him to call if he wanted to talk further. According to Trooper Jones, Defendant responded that "he live[d] his life a certain way for so many years and threw it away for one mistake." When Trooper Jones said "now's the time to get it off your chest[,]" Defendant explained that A.A. "had asked [him] to show her his penis, because her uncle used to show her his" and that Defendant did so. Defendant then wrote out a letter of apology which stated: "I'm sorry for what happened between [sic] the incident

3

with [A.A.] I mad [sic] a big mistake by showing her my penis win [sic] she asked me to so if you can please forgive me[.]"

**Discussion and Decision**

As noted above, Defendant has presented 10 points of alleged trial court error. For ease of analysis, we will consider some of Defendant's points in combination and out of order due to the intertwined nature of the issues presented. Additional facts necessary to the disposition of the case are included below as we address Defendant's points.

*Point 4*

Defendant's fourth point involves testimony adduced from child abuse investigator Buchanan during two parts of her direct examination. In the first relevant portion, she gave the following testimony:

Q. All right. So, this, I take it, was not your first investigation of a sexual act, abuse on a child?

A. No, sir.

Q. Do you know – can you tell the jury about how many you did or was it too numerous to lose [sic] track of?

A. It was too numerous to – to lose [sic] track of. In nine years, I would average, oh, several cases – alleged cases a year.

Q. Now, to be fair to the jury, not – were all those always substantiated?

A. No, sir. Uh-uh.

Q. And how about this one?

A. This – this one was found preponderance of the evidence.

Q. All right. Now, you understand that's not the same burden necessarily that we're looking at here today?

A. No, sir. Our – our criteria is [sic] much different than law enforcement and court.

4

Buchanan was unable to determine from her initial interview with A.A. whether something criminal had happened, so a forensic interview at the Child Advocacy Center (CAC) was conducted. In the second relevant portion of Buchanan's testimony, she recounted her conversation with police after the forensic interview had been conducted:

Q. All right. So, eventually, did you – were you made aware of the fact that the interview was completed and there was a transcript –

A. Yes.

Q. – by the CAC – Child Advocacy Center in West Plains?

A. Yes.

Q. And did you receive a call from Sheriff Chris Degase?

A. Yes, I did.

Q. And what was the purpose of that call, if you recall?

A. The purpose of the call the first time was to find out if the interview had been conducted, which it did. He wanted to know what had happened, and I told him just briefly. And I told him that, in my opinion, there was enough in this child's statement to say that – that most likely something had happened. He requested a copy of my report, and he asked that the CAC send the information, which they automatically do, but he asked anyway, to get the CAC DVD.

All of the foregoing testimony from Buchanan was admitted without objection. Defendant contends the trial court plainly erred by allowing "the State to elicit evidence from Robin Buchanan that she had found A.A.'s allegations by a 'preponderance of the evidence,' and that 'in [her] opinion, there was enough in this child's statement to say that … most likely something had happened,' because … Buchanan's 'findings' invaded the province of the jury[.]"

Rule 30.20 provides, in pertinent part, that "plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." *Id*. "A claim of plain error

5

places a much greater burden on a defendant than an assertion of prejudicial error." ***State v. Wright***, 216 S.W.3d 196, 199 (Mo. App. 2007). Plain error and prejudicial error are not synonymous terms, and mere allegations of error and prejudice will not suffice. ***Id***. "Plain error must be evident, obvious, and clear." ***State v. Walter***, 479 S.W.3d 118, 131 (Mo. banc 2016). "Plain error can serve as the basis for granting relief on direct appeal only if the error was outcome determinative." ***State v. Placke***, 290 S.W.3d 145, 153 (Mo. App. 2009). "A finding of outcome-determinative prejudice expresses a judicial conclusion that the erroneously admitted evidence so influenced the jury that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion but for the erroneously admitted evidence." ***State v. Barriner***, 34 S.W.3d 139, 150 (Mo. banc 2000) (internal quotation marks and citation omitted).

Defendant argues that the trial court committed plain error in allowing Buchanan, an expert sexual assault investigator, to testify about whether a sexual assault occurred based solely on her view of A.A.'s believability.[2] Defendant relies upon the following three cases to support that argument.

In ***State v. Churchill***, 98 S.W.3d 536 (Mo. banc 2003), our Supreme Court held that the defendant was deprived of a fair trial when the victim's doctor testified that the victim's abuse "was real" based solely on the victim's change in demeanor when recounting the abuse. ***Id***. at 538-39. The victim had no physical signs of abuse. ***Id***. at 539 n.8.

In ***State v. Foster***, 244 S.W.3d 800 (Mo. App. 2008), the doctor who conducted the victim's examination testified that he believed the victim was sexually abused based

---

[2] Defendant's argument assumes Buchanan was as an expert witness. Without deciding the issue, we make the same assumption for the purpose of addressing this point.

6

solely on her statements. Again, there was no physical evidence of abuse. *Id*. at 802. The doctor compounded the impropriety of his testimony by stating that his years of experience allowed him to determine a child's truthfulness in alleging abuse. *Id*. This Court held that the admission of the doctor's testimony was prejudicial error. *Id*. at 804.

In *State v. Clements*, 789 S.W.2d 101 (Mo. App. 1990), a doctor testified that the defendant had deliberated prior to killing the victim. *Id*. at 107. This Court concluded that the issue of deliberation was for the jury to determine, and the admission of expert testimony on that issue deprived the accused of a fair trial. *Id*. at 110-11. *Clements* was distinguished in *State v. Mackey*, 822 S.W.2d 933 (Mo. App. 1991), because the witness' testimony in *Mackey* did not point to the defendant being the perpetrator of a child's sexual abuse. *Id*. at 937-38.

This case is factually distinguishable from *Churchill*, *Foster* and *Clements*. First, Defendant's oral and written admissions to the police directly implicate him as the perpetrator of the offense against A.A. Second, the relevant portions of Buchanan's testimony were brief and were not highlighted during closing argument. *See State v. Wadlow*, 370 S.W.3d 315, 322 (Mo. App. 2012); *Clements*, 789 S.W.2d at 110. Third, Buchanan acknowledged that the preponderance-of-the-evidence threshold she used during her investigation was much different than the one to be used by the jury. *See State v. Smith*, 422 S.W.3d 411, 418 (Mo. App. 2013). Buchanan's testimony that "most likely something had happened" considered in context, merely explained her role in the investigative process. *See State v. White*, 466 S.W.3d 682, 687-89 (Mo. App. 2015). Neither portion of Buchanan's testimony stated that Defendant had abused A.A. The import of Buchanan's testimony was that someone had abused A.A. *See Mackey*, 822 S.W.2d at 937-38; *see also Wadlow*, 370 S.W.3d at 322. Given these differences,

7

Defendant has failed to meet his burden of showing an evident, open and obvious error by the trial court in not intervening *sua sponte* to prevent the testimony from Buchanan that is being challenged on appeal. Point 4 is denied.

*Point 5*

Defendant's fifth point involves the following testimony given by Father during his direct examination at trial:

> Q. Now, I want to ask you one final question, [Father]. To your knowledge, has anyone ever molested [A.A.] besides Mr. Riggs?
>
> A. No.
>
> [DEFENSE COUNSEL]: Objection, Your Honor. That's what's on trial here.
>
> [PROSECUTOR]: Well, I'm asking besides Mr. Riggs.
>
> [DEFENSE COUNSEL]: Yeah. But you're alleging that that has happened, and that's what's on trial now.
>
> [PROSECUTOR]: Allegedly.
>
> THE COURT: Overruled. Overruled.
>
> BY [PROSECUTOR]:
>
> Q. You may answer.
>
> A. No.

Defendant argues that the "trial court abused its discretion in overruling defense counsel's objection to the prosecutor's question, posed to [Father], as to whether anyone else had ever molested A.A. besides [Defendant], because … the prosecutor's question invaded the province of the jury and amounted to unsworn testimony by the prosecutor on the ultimate fact at issue[.]"

Defendant's argument ignores the fact that essentially the same testimony was given by Stepmother without objection during her direct examination:

8

Q. All right. And the counselor [Dr. Wilson] told you to do what?

A. [Dr. Wilson] hotlined DFS and told my husband and I we needed to report what we had found out to the sheriff's department.

Q. And did you?

A. Yes.

Q. Now, I probably left out a step. At some point, did you call your husband, [Father]?

A. Yes.

Q. And what – do you remember where he was working, by chance?

A. He was working in Mansfield that week.

Q. And did he – did he come down?

A. Yes. He met me at [Dr. Wilson's] office.

Q. Now, I want to ask you: Up until that time, had you ever been aware that [A.A.], your youngest stepdaughter, had ever been touched inappropriately by anybody?

A. No.

Q. Ever been touched since then inappropriately by anyone?

A. No.

On appeal, Defendant has not challenged the admission of this testimony by Stepmother. It is well settled law that "[a] defendant is not prejudiced when allegedly improper evidence was merely cumulative to other evidence admitted without objection establishing the same facts." *State v. Hutson*, 487 S.W.3d 100, 108 (Mo. App. 2016); *see also State v. Davies*, 330 S.W.3d 775, 797 (Mo. App. 2010). Therefore, the trial court's decision to overrule the objection to Father's testimony was not prejudicial. Point 5 is denied.

9

*Points 2 and 3*

Points 2 and 3 arise from the following cross-examination of Defendant about his prior criminal conviction:

Q. Have you – do you have any criminal record? Have you been convicted – let me ask it this way. Have you been convicted of any crimes in this state or any other state?

A. I do – a DUI.

Q. Oh, just a DUI?

A. Yeah.

Q. And where was that at?

A. That was in Arizona.

Q. And would you tell the jury what type of rig you were driving?

A. I do believe it was a Freightliner semi.

Q. Semi Freightliner.

A. Right.

Q. And you got a pretty hefty fine for that, didn't you?

A. Yeah.

Q. And, of course, you rushed right out and paid it, didn't you?

A. No.

Q. In fact, there's a warrant for you for not paying it in Arizona, isn't there?

A. That's because the – when I got arrested, when I was making my payments that I set up with them, they put a no-hold bond warrant out for me because I – I'm in here, in jail.

Q. So, it wasn't for nonpayment?

A. That's just because my payments had stopped.

Q. Oh, it was for nonpayment. All right.

A. Right.

….

Q. I'm going to show you what's been marked Exhibit 14 from the Kingman, Arizona, and apparently that's some kind of record from out there. So, tell us if you can identify that, will you, Mr. Riggs?

A. Yes. It was driving a – driving a vehicle while under influence of intoxication liquors or – as a commercial driver of a .04 or less.

Q. All right. Because as a commercial truck driver – and you knew this because you were – held yourself out to be a professional, right? You can't drive – for everybody else, it's .08, but for professional drivers, it's .04, isn't it?

A. I didn't know that at the time.

Q. Oh, you didn't?

A. No.

All of this testimony was admitted without objection. The trial court then admitted Exhibit 14, a certified copy of Defendant's Arizona conviction, over defense counsel's objection that Defendant had already admitted to the DUI.

Defendant's second point contends the "trial court plainly erred in allowing the State to cross-examine [Defendant] about the details and underlying facts leading to his prior DUI conviction … in that … 'no further justification existed for inquiry into the details of the prior crime' …." Because plain error review is involved, Defendant is not entitled relief unless the error was outcome determinative. *Placke*, 290 S.W.3d at 153. To meet that standard, we must conclude that "the erroneously admitted evidence so influenced the jury that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion but for the erroneously admitted evidence." *Barriner*, 34 S.W.3d at 150.

11

The procedure for impeaching a witness using a criminal conviction is set out in § 491.050 RSMo (2000), which states:

> Any person who has been convicted of a crime is, notwithstanding, a competent witness; however, any prior criminal convictions may be proved to affect his credibility in a civil or criminal case and, further, any prior pleas of guilty, pleas of nolo contendere, and findings of guilty may be proved to affect his credibility in a criminal case. Such proof may be either by the record or by his own cross-examination, upon which he must answer any question relevant to that inquiry, and the party cross-examining shall not be concluded by his answer.

*Id*. Because Defendant took the stand, he opened the door to an attack on his credibility through proof of his prior conviction. *See **State v. Tramble***, 383 S.W.3d 34, 40 (Mo. App. 2012). For the purpose of impeachment, the prosecutor had an absolute right to inquire into the nature, date, place and resulting sentence for the prior conviction. *Id*. The only restriction was that the prosecutor not go into the details of the crime leading to the conviction. *Id*.

According to Defendant, he is entitled to plain error relief because the following three portions of his testimony were unduly prejudicial: (1) Defendant was driving a semi-truck at the time; (2) he incurred a "hefty fine" that he did not immediately pay; and (3) a warrant was issued for his nonpayment. We disagree. The testimony about the type of vehicle Defendant was driving went to the nature of the crime because he was convicted under a statute that only applied to commercial drivers. The testimony that he had to pay a "hefty fine" that was not immediately paid went to the resulting sentence. The imprecision in characterizing the fine as "hefty" may have redounded to Defendant's benefit and certainly did not warrant *sua sponte* intervention by the trial court. The admission of the testimony that a warrant was issued for nonpayment of the fine is not an evident, open and obvious error because it arguably went to the sentence imposed and did not involve improper details about the crime itself. More importantly, Defendant has

12

failed to persuade us that there is a reasonable probability the jury would have reached a different conclusion if the warrant testimony had been excluded. *See Barriner*, 34 S.W.3d at 150. The cases cited by Defendant are factually distinguishable.

In *State v. Sanders*, 634 S.W.2d 525 (Mo. App. 1982), the accused was charged with rape. On direct examination, he admitted that he had previously been convicted of two counts of rape and one count of kidnapping. On cross-examination, the prosecutor read verbatim from the felony informations for the earlier rape and kidnapping charges. *Id*. at 526-27. The appellate court held that constituted prejudicial error because the informations were graphic, repetitive and used only to show that Defendant had a tendency to commit rape. *Id*. at 527.

In *State v. Phelps*, 677 S.W.2d 418 (Mo. App. 1984), the accused was charged with robbery in the first degree and admitted on direct examination that he had previously pleaded guilty to robbery in the second degree. *Id*. at 419. On cross-examination, the "court permitted the state to inquire as to the planning, acquisition of weapon, and the relationship between the defendant as a resident of the city of St. Louis and the location of the crime, St. Louis County." *Id*. at 421. The appellate court held that this was prejudicial error because it exceeded the allowable scope of impeachment pursuant to § 491.050 by inquiring about the details of the crime. *Id*.

In *State v. Aye*, 927 S.W.2d 951 (Mo. App. 1996), the accused was charged with the possession of cocaine and admitted on direct examination that he had been convicted of the same offense twice in the past. *Id*. at 953. On cross-examination, the state inquired into the details of the earlier convictions in order to show the defendant's knowledge that the substance was cocaine. *Id*. at 956. Because knowledge was not contested, this line of inquiry was prejudicial error. *Id*.

The case at bar is unlike *Sanders*, *Phelps* or *Aye*. Defendant's prior conviction was not the same as the crime for which he was being tried, and the prosecutor never argued that Defendant's DUI shows a propensity to commit statutory sodomy. In closing argument, the prosecutor's only reference to alcohol was what Defendant himself had stated – that he had been drinking on the day when he claimed A.A. asked to see his penis. Moreover, two of the three areas of inquiry during Defendant's cross-examination were proper impeachment that went to the nature of the crime and resulting sentence. The third area of inquiry about the warrant was not the sort of evident, open and obvious error that required *sua sponte* intervention by the trial court, and there is no reasonable probability that it affected the outcome of the trial. Point 2 is denied.

In Point 3, Defendant contends the trial court abused its discretion in allowing the State to introduce Exhibit 14 into evidence. Defendant argues that Exhibit 14 contains the same unduly prejudicial information already identified and discussed in Point 2. We have already denied plain error relief as to that testimony, which was admitted without objection. As noted above, a defendant is not prejudiced by the admission of allegedly improper evidence when the same facts were established without objection by other evidence. *See* **Hutson**, 487 S.W.3d at 108; **Davies**, 330 S.W.3d at 797. Because the challenged facts in Exhibit 14 were cumulative of Defendant's own testimony, Point 3 is denied.

### *Point 6: Child Advocate Holding Teddy Bear*

Defendant's sixth point arises from the following facts. A child advocate for A.A. had been seated at the prosecutor's counsel table for most of the trial. During a recess just before A.A. testified, defense counsel objected to A.A. being permitted to hold a teddy bear during her testimony because the notice and hearing requirements of

14

§ 491.725.3(4) had not been met. The court sustained the objection and ruled that the child advocate, not A.A., could hold the teddy bear for A.A. at the prosecutor's counsel table.

After the jury returned, the trial resumed. A.A. was called as a witness and questioned about her understanding of the oath to tell the truth. As the prosecutor started to question A.A., the following colloquy occurred at a bench conference:

> [DEFENSE COUNSEL JOHNSON]: We have to object to the way [child advocate's] holding the teddy bear. It's drawing attention to it. It's unfairly prejudicial.
>
> [DEFENSE COUNSEL BABCOCK]: It should be on the record that she's holding it right in front of the jury and took it away right in front of the jury from the child.
>
> THE COURT: Okay. All right.
>
> [DEFENSE COUNSEL BABCOCK]: It's more prejudicial than if she didn't take it away.
>
> THE COURT: Okay. All right. Overruled. You may continue.
> (Proceedings returned to open court.)

Defendant's sixth point contends that the "trial court abused its discretion in … allowing the 'child advocate' to hold a teddy bear at the table in view of A.A., and in front of the jury, because … it was contrary to Section 491.725 …." The relevant subsection of this statute states:

> Upon motion made by the child, his or her representative, or any party to the judicial proceeding, at least thirty days in advance of the judicial proceeding, *the court may allow the child to have a toy, blanket, or similar item in his or her possession while testifying*, but such item shall only be allowed if:
>
> (a) All parties agree; or
>
> (b) If the movant shows the court by a preponderance of evidence that:
>
>> a. The child in question cannot reliably testify without the item in his or her possession; and

15

b. Allowing the item is not likely to prejudice the trier of
fact in hearing and evaluating the child's testimony[.]

§ 491.725.3(4) (italics added). This subsection only restricts the child's possession of a toy while testifying. A.A. did not possess the teddy bear while testifying. Therefore, we find no merit in Defendant's argument that the trial court's decision to allow the child advocate to hold the teddy bear violated the provisions of § 491.725.3(4). Point denied.

*Point 7*

Defendant's seventh point arises from the following facts. The case was set for a jury trial to commence on July 29, 2014. Defense counsel designated their expert witnesses on July 2, 2014. One of those experts was Dr. Rosalyn Schultz (Dr. Schultz). On July 25, 2014 (the Friday before the trial started on Monday), the prosecutor filed a motion to compel disclosure of Dr. Schultz' report. It was faxed to the prosecutor at 3:39 p.m. that same day.

On the morning trial commenced, the prosecutor moved to strike Dr. Schultz as an expert. The court took that motion with the case. Prior to Dr. Schultz' testimony, the prosecutor renewed the motion to strike due to the lack of opportunity to depose Dr. Schultz or prepare to cross-examine her. The trial court was concerned about permitting Dr. Schultz to testify because her report was provided to the prosecutor such a short time before trial commenced. Out of an abundance of caution, however, the court made the following ruling:

> The Court's order is going to be as such, and this is not fair to the State. But what is going to happen, the Court is going to allow … Dr. Schultz to testify. It is going to be very – very narrow in scope, especially due to this summary coming in the day – the last working day before trial. The Court will let her testify as to the proper way to conduct a CAC interview or the – or this other interview that Ms. Buchanan conducted, what wasn't proper about it …. [T]he Court will allow her to just testify about proper interview techniques only because this child – and only as it relates to a child this age. This is not going to take very long, and we're not going –

16

we're not going on a huge fishing expedition with this, period. And we're not going to get into whether – whether this testimony was truthful or untruthful. It is basically going to be how to do an interview on a seven- or eight-year-old kid, period.

During Dr. Schultz' direct examination, she testified about the following generally accepted guidelines and best practices for first responders in a sexual abuse case: (1) the child's initial interview should be a brief, fact-finding interview; and (2) the interviewer should not name the alleged perpetrator or give any details about the case because that would be leading, suggestive and inappropriate. Defense counsel then adduced the following testimony from the witness:

Q. So, if best practices are not followed, how could that possibly influence the first interview?

A. It can influence the first interview because the child is receiving initially – the first time the child is being interviewed in the – in the formal investigation, the child is being interviewed and being given information that the child had not yet said, so that it can be that the child – and there can be children that can assume then that they're supposed to be saying what – and giving that information because it was given by an authorative [sic] figure, for example. And it can taint the outcome of the case.

Q. When you say "taint the outcome of the case," what do you mean?

A. It – it could – it could affect what the child actually states.

[PROSECUTOR]: Well, I'm going to object, Judge. That is not a conclusion permissible by this expert.

THE COURT: Sustained.

[PROSECUTOR]: I'm going to ask that her answer be stricken from the record.

THE COURT: Okay. Folks, disregard the last answer.

Dr. Schultz then testified about the following best practices and guidelines for CAC interviews: (1) let the child do the talking; (2) ask open-ended questions; and (3) don't

17

use suggestive questions. Dr. Schultz testified that "there were several significant best-practice guidelines that were not followed" in the CAC interview of A.A.

In Point 7, Defendant contends the trial court abused its discretion in sustaining the foregoing objection and striking Dr. Schultz' answer. Defendant argues that this ruling was an improper limitation upon the expert's testimony. We disagree.

The decision to exclude evidence as a discovery sanction is left to the trial court's discretion. *State v. Hillman*, 417 S.W.3d 239, 245 (Mo. banc 2013). We will reverse a discovery sanction ruling on appeal only when the sanction results in fundamental unfairness to the defendant. *Id*. at 245-46. That standard has not been met here. Dr. Schultz' report was not provided to the prosecutor until late Friday afternoon before the Monday commencement of trial. Because of the timing of that disclosure, the trial court limited Dr. Schultz' testimony to the general topic of the proper method of interviewing a child victim in a sexual abuse case. The court decided that Dr. Schultz would not be permitted to testify about whether A.A.'s testimony would be truthful or untruthful. Dr. Schultz was allowed to testify about best practices and accepted guidelines for both an initial and a CAC interview of a child. The trial court's ruling left standing Dr. Schultz' answer that failure to follow best practices could influence the child and taint the outcome of the case. The court only struck Dr. Schultz' testimony that "it could affect what the child actually states." We find no abuse of discretion in this ruling. More importantly, the exclusion of this one answer did not result in fundamental unfairness to Defendant because Dr. Schultz was allowed to testify extensively about best practices and accepted guidelines for child interviews. Point 7 is denied.

18

*Point 8*

Defendant's eighth point arises from the following facts. During the State's case-in-chief, the prosecutor presented evidence that Father and Stepmother took A.A. to see her therapist, Dr. Wilson, before A.A. was taken to the county sheriff's office. It was during Defendant's case-in-chief that Dr. Schultz testified about the best practice and guidelines for performing an initial interview of a child sexual abuse victim. As mentioned previously, Dr. Schultz testified that the failure to follow those best practices could influence the first interview and taint the outcome of the case.

After the defense rested, the prosecutor called Dr. Wilson as a rebuttal witness. The prosecutor stated that the purpose of Dr. Wilson's testimony would be "to rebut Dr. Schultz because Dr. Schultz says that you can't basically believe anything [A.A.] said because the interviewing techniques were flawed." Defense counsel objected that Dr. Wilson's testimony would not be proper rebuttal. The trial court ruled that it would allow Dr. Wilson "to testify as to questioning a child of this age …."

In relevant part, Dr. Wilson gave the following rebuttal testimony. She was a licensed psychologist with a doctorate in clinical psychology. She provided individual therapy to A.A. After A.A. reported the sexual abuse, Father and Stepmother brought A.A. to Dr. Wilson's office. Dr. Wilson was a mandated reporter of child sexual abuse cases. She reported the incident and advised Father and Stepmother to contact law enforcement. Dr. Wilson also talked to A.A. at the office. Dr. Wilson was careful about what she asked A.A., so as not to interfere with a forensic interview or an investigation that might ensue after she made her mandatory report.

In Point 8, Defendant contends the trial court abused its discretion in permitting Dr. Wilson to testify as a rebuttal witness. Defendant argues that Dr. Wilson's testimony

19

was not proper rebuttal because "it did not explain, counteract, or refute evidence offered by the defense." We disagree.

A trial court is vested with broad discretion concerning the admission and scope of rebuttal evidence. *State v. Hurley*, 208 S.W.3d 291, 293 (Mo. App. 2006). "Rebuttal evidence may directly or indirectly explain, counteract, repel, or disprove a defendant's evidence either directly or by implication." *State v. Hamilton*, 892 S.W.2d 371, 379 (Mo. App. 1995). An appellate court will not interfere with the exercise of a trial court's discretion unless it is clear that the court's ruling is against the logic of the circumstances and is "so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." *Hancock v. Shook*, 100 S.W.3d 786, 795 (Mo. banc 2003). We find no abuse of discretion here. Dr. Schultz testified that failure to follow best practices and guidelines during an initial interview of a child sexual abuse victim could influence the interview and taint the outcome of the investigation. The trial court properly allowed Dr. Wilson to testify about the limited nature of her questioning of A.A. to rebut any inference that Dr. Wilson's interview tainted the outcome of the ensuing investigation by the police and forensic interviewers. Defendant's argument that Dr. Wilson's short and focused testimony improperly bolstered Stepmother's testimony is unpersuasive. Point 8 is denied.

*Point 1*

Point 1 seeks relief pursuant to Rule 30.20 based upon an alleged plain error committed by the trial court during the prosecutor's closing argument. As previously explained, Rule 30.20 states in relevant part that "plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest

20

injustice or miscarriage of justice has resulted therefrom." *Id*. "Plain error must be evident, obvious, and clear." *State v. Walter*, 479 S.W.3d 118, 131 (Mo. banc 2016).

Point 1 arises from the following facts. Just prior to opening statements, defense counsel asked that the rule on witnesses be invoked. The trial court granted the request. On the morning of the second day of trial, the prosecutor informed the court that defense counsel had endorsed Defendant's daughter, A.R. (Daughter), as a witness. The prosecutor objected to Daughter being called as a witness because she had been in the courtroom the prior day listening to all of the testimony, including that given by A.A. Because defense counsel had invoked the rule on witnesses and Daughter had been in the courtroom the prior day, the trial court excluded her testimony. Defense counsel later made an offer of proof out of the presence of the jury. During the prosecutor's closing argument, he argued without objection that "the State contends [Defendant] was in the basement with [A.A.], and that's not rebutted by anyone other than the Defendant."

Defendant argues that the trial court committed a plain error by allowing the foregoing argument because: (1) Daughter's testimony was excluded at the State's request; and (2) the prosecutor's argument resulted in manifest injustice because the jury was urged to draw "an adverse inference from the absence of evidence which was excluded at the State's request[.]" We find no merit in this argument.

In *State v. Barlow*, 162 S.W.3d 135 (Mo. App. 2005), the western district of this Court summarized the applicable principles that guide our review of this issue:

> A prosecutor is not permitted to comment on or refer to evidence or testimony that the court has excluded. In particular, the State may not intentionally misrepresent the facts in closing argument by informing the jury that no evidence exists when evidence was offered by the defendant but the State successfully caused the evidence to be excluded. Whether that error requires reversal depends on the circumstances of the particular case, and particularly on the strength of the other evidence and whether

21

the prosecutor intentionally misrepresented the facts in making the comment.

*Id*. at 143 (quotation marks and citations omitted). The defendant in ***Barlow*** was charged with murder, but he claimed that a man named Miles was the "ring leader" and primarily responsible for the charged crime. *Id*. at 141. To support this theory, the defendant attempted to admit into evidence a statement by Miles to the police in which Miles claimed to have struck the victim several times with a hammer and said it was his idea to dispose of the body in a storm sewer. *Id*. The trial court sustained the prosecutor's hearsay objection to the statement. *Id*. at 141-42. During closing argument, the prosecutor addressed defendant's claim that Miles was the "ring leader" in the following manner: "There's no evidence to support this Miles accusation. The only evidence you have is coming from this defendant." *Id*. at 142. The defendant appealed and raised a plain error claim that the prosecutor had improperly commented on excluded evidence. *Id*. at 143. The ***Barlow*** court observed that the excluded statement did not support the defendant's claim that Miles was the "ring leader," but instead showed only that Miles joined the defendant in committing the murder and participated in the cover-up. *Id*. Accordingly, the prosecutor correctly observed that the defendant's testimony was the only evidence presented to support his claim to the contrary. *Id*. The ***Barlow*** court concluded that no plain error resulted from the prosecutor's statement and noted further that "[p]rosecutors are entitled to argue matters supported by the evidence or matters reasonably inferable from the record. That includes pointing out to the jury an absence of evidence to support a theory suggested by the defendant." *Id*. (quotation marks and citations omitted).

We reach the same conclusion here. Defendant premises his argument on the following portion of Daughter's excluded testimony:

22

Q. And to your knowledge, was your dad ever alone with any of the children?

A. No. Just me and my sister.

Our review of the entire offer of proof, consisting of seven pages of transcript, reveals the following. On the date in question, Daughter arrived home from school sometime *after* Defendant had picked up the other children, including A.A. Therefore, Daughter did not, and could not, account for Defendant's activities during the entire time when Defendant was alone with the children. Accordingly, Daughter's excluded testimony would not have been sufficient to rebut the allegation that Defendant and A.A. were, at some point, alone in the basement. For this reason, the prosecutor did not misrepresent the evidence by claiming that the only evidence to rebut the State's theory was Defendant's testimony.

The cases cited by Defendant are factually distinguishable because they involve instances in which a prosecutor deliberately misrepresented the nature or existence of evidence that had been offered, but excluded. *See, e.g.*, **State v. Williams**, 119 S.W.3d 674, 679-81 (Mo. App. 2003) (prosecutor's statement to the jury that "there's not one piece of evidence" supporting the theory that alleged victim was lying was plain error where tape-recording of alleged victim's inconsistent statements had been improperly excluded); **State v. Weiss**, 24 S.W.3d 198, 200-02 (Mo. App. 2000) (prosecutor's statement to the jury that "not one single record, no payroll record, nothing, to show that this other money even ever existed" in reference to defendant's "buy-out" defense in stealing case was plain error where documents tending to support that defense had been offered and excluded on hearsay grounds); **State v. Hammonds**, 651 S.W.2d 537, 539 (Mo. App. 1983) (prosecutor's statement to the jury that a witness in the court room did not testify for fear of perjury was plain error where prosecutor had precluded witness' testimony on the basis of late disclosure).

23

In sum, Defendant has failed to demonstrate that the prosecutor's challenged comment constituted an evident, obvious and clear error requiring the trial court to intervene *sua sponte* in closing argument. *See State v. Ramirez*, 447 S.W.3d 792, 799 (Mo. App. 2014). Point 1 is denied.

*Points 9 and 10*

Points 9 and 10 also challenge comments by the prosecutor during closing argument. Both points again ask this Court to review for plain error.

In Point 9, Defendant contends the trial court plainly erred in failing to *sua sponte* declare a mistrial when the prosecutor misattributed testimony that "this is the way little girls are and that she found nothing unusual about it" to Dr. Wilson because those facts were not in evidence. While Dr. Wilson did not give the testimony attributed to her by the prosecutor, similar testimony was received in evidence by two other witnesses, Buchanan and the CAC forensic interviewer, Tina Ahad. This Court has previously found no manifest injustice from a similar situation where the prosecutor referred to facts in evidence but attributed the testimony to the wrong witness. *See State v. Farmer*, 777 S.W.2d 322, 323-24 (Mo. App. 1989). Defendant has likewise failed to demonstrate the existence of manifest injustice in this case. Point 9 is denied.

In Point 10, Defendant contends the trial court plainly erred in failing to *sua sponte* instruct the jury to disregard the prosecutor's closing arguments about why he filed charges against Defendant because those comments improperly implied that the prosecutor had evidence that the jury had not heard establishing the truth of A.A.'s allegations. Just before summarizing the evidence, the prosecutor stated:

> There's a lot of charges that come across the desk. I think – I believe it was Tina Ahad that said, hey, most of these are unsubstantiated. I'm talking about these sexual crimes. And there are a lot of cases I receive that I don't file on. It's not necessarily that I don't believe the victim, but

24

they're just not provable. Sometimes people are in divorce cases and there's been a bunch of nonsense going on back and forth, and sometimes there's neighbors and there's relative squabbles, you know. And I've got to pick the ones that I think a jury will believe, you know. Of course, sometimes I might see it a little differently than what you all might see. That's why you're here to determine the facts. … I do try to pick the cases I think are serious, and this is a serious case. And I happen to believe that the Defendant did just what he's charged with in this case. Of course, you'll be the ultimate decider of that.

Defendant maintains that the prosecutor's statements improperly vouched for the truth of the State's case based on evidence not before the jury. We disagree.

Improper vouching occurs when the State implies that it has facts establishing the veracity of witnesses and the truthfulness of its case that are not before the jury for its consideration. *State v. Collins*, 150 S.W.3d 340, 351-52 (Mo. App. 2004). The State may, however, express personal opinions on matters, including guilt, where they are fairly based on the evidence. *Id.* at 352.

The challenged statements here, when taken in context, expressed the prosecutor's view that: (1) this was not a case of unsubstantiated charges between parties as part of an ongoing dispute; and that (2) based on the evidence, Defendant was guilty of the crimes charged. The argument did not imply a knowledge of outside facts, nor did it improperly vouch for the credibility of the state's witnesses. *See, e.g.*, *State v. Chism*, 252 S.W.3d 178, 187 (Mo. App. 2008). We further note the prosecutor emphasized during the argument that the jury was the ultimate judge of the facts and was not bound by the State's opinion. The trial court did not plainly err in failing to *sua sponte* intervene in the argument. Point 10 is denied.

Finding no merit in any of Defendant's points, the judgment of the trial court is affirmed.

25

JEFFREY W. BATES, J. – OPINION AUTHOR

MARY W. SHEFFIELD, C.J. – CONCUR

DANIEL E. SCOTT, P.J. – CONCURS BY SEPARATE OPINION



# Missouri Court of Appeals

## Southern District

### Division One

STATE OF MISSOURI,           )
                             )
            Respondent,       )
                             )
v.                           )        No. SD33565
                             )
JAMES A. RIGGS,              )
                             )
            Appellant.        )

APPEAL FROM THE CIRCUIT COURT OF DOUGLAS COUNTY

Honorable R. Craig Carter, Judge

**OPINION CONCURRING IN RESULT**

I differ with the majority opinion in several respects, but see no practical value in detailing those differences as I too would deny each point, albeit sometimes on a different basis. Because I find no preserved prejudicial error, and certainly no plain error justifying relief, I concur in the result.

DANIEL E. SCOTT, P.J. – SEPARATE OPINION AUTHOR